OPINION OF THE COURT
SONDRA K. PARDES, J.
In this action by homeowners for damages arising from a spill of home heating oil during delivery, the plaintiffs move for an order pursuant to CPLR 3212 granting them summary judgment on the issue of liability against the defendants, on the grounds that they are strictly liable as a matter of law under section 181 of the Navigation Law, and for an order dismissing the first and fourth affirmative defenses asserted by the defendants in their answer.
The defendants oppose the plaintiffs’ first request for relief, arguing that the quantity of the spill was not significant enough to trigger strict liability under section 181.
For the reasons set forth below, the motion is granted.
Summary Judgment
On a motion for summary judgment, it is the proponent’s burden to make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact (JMD Holding Corp. v Congress Fin. Corp., 4 NY3d 373, 384 [2005]). Failure to make such a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (id.). However, if this showing is made, the burden shifts to the party opposing the summary judgment motion to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]).
The plaintiffs argue that they are entitled to summary judgment against the defendants on the question of liability under Navigation Law § 181, as it is undisputed that the defendants spilled petroleum onto the plaintiffs’ property. Section 181 of the Navigation Law imposes strict liability on any party that has “discharged” petroleum, regardless of fault, “for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained.” (Navigation Law § 181 [1]; see also *315 Fuchs & Bergh, Inc. v Lance Enters., Inc., 22 AD3d 715 [2d Dept 2005].) Section 172 defines “discharge” to mean “any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow or drain into said waters” (Navigation Law § 172 [8] [emphasis added]). “Waters” includes all “bodies of surface or groundwater, whether natural or artificial.” (Navigation Law § 172 [18].) Section 181 (5) expressly creates a private right of action for an injured person against the person who discharged the petroleum.
The court finds that the plaintiffs have satisfied their prima facie burden, entitling them to summary judgment in their favor on the question of defendants’ strict liability. In support of their motion, the plaintiffs submit, among other evidence, a copy of the oil spill report filed with the Department of Environmental Conservation (DEC), which describes the spill as 10 gallons and lists the “resource affected” as “soil”; and a copy of the incident report completed by William Konecky, a service technician for the defendants, in which he states that he “found seepage from oil fill and vent piping” in the plaintiffs’ basement as well as “oil soaked dirt under the vent pipe outside of the house,” and that he dug up and removed approximately two five-gallon pails of dirt from the area; and an affidavit from each plaintiff attesting that they smelled a “strong odor of oil” upon entering the home after the incident.
The burden therefore shifts to the defendants to provide evidentiary proof sufficient to demonstrate the existence of a material question of fact requiring a trial as to liability. The defendants do not dispute that they are responsible for a release of petroleum onto the plaintiffs’ land caused by overfilling the plaintiffs’ home heating oil tank. The defendants’ sole argument in opposition to summary judgment is that the spill was too negligible to pose any risk that it “might flow or drain into” surface water or groundwater, and that therefore, the spill did not constitute a “discharge” of petroleum as defined by the statute (see Navigation Law § 172 [8]). They contend that the DEC report erroneously reflects a 10-gallon spill when in fact the spill was much smaller. They estimate that between one quart and two gallons leaked inside the house, and that a “small amount” also “burped” out of the vent pump and landed on the dirt outside the house.
This court must therefore address whether, as a matter of law, a petroleum spill on residential land may be so negligible *316 that Navigation Law § 181 will not apply against a party who has admitted to causing the spill. If so, the court must determine whether the defendants here have proffered sufficient evidence that their spill was too negligible to fall under Navigation Law § 181, in order to escape summary judgment.
Neither party has identified any case law specifically addressing this question, and the court’s diligent efforts have also revealed no case directly on point. The case law that does exist generally supports the plaintiffs’ position. The Second Department has previously granted summary judgment to a plaintiff upon facts analogous to the present ones—the imposition of strict liability upon a deliverer of residential heating oil who overfilled the oil tank—but it did so without any discussion of the size of the spill, and there is nothing in the Court’s decision to suggest that the defendants in that case raised as a defense the de minimis nature of the spill. (See Fuchs & Bergh, Inc. v Lance Enters., Inc., 22 AD3d 715, 716 [2d Dept 2005].) Similarly, the Third Department has repeatedly recognized that a trial court may take judicial notice that a particular spill on land was in danger of reaching groundwater, without any specific proof that it did. (See e.g. Domermuth Petroleum Equip. & Maintenance Corp. v Herzog & Hopkins, 111 AD2d 957, 959 [3d Dept 1985] [where oil “leaked into a subgroundlevel basement,” Court took judicial notice that “there was a substantial likelihood that, if not cleaned up, it would proceed to seep into the surrounding groundwater”]; Merrill Transp. Co. v State of New York, 94 AD2d 39, 42-43 [3d Dept 1983] [“While there is nothing in the record to positively demonstrate that the spilled oil might have flowed into protected waters, judicial notice can be taken of the common knowledge that oil can seep through the ground into surface and groundwater near a highway and thereby cause ecological damage”].)
The court also finds that the defendants’ position is inconsistent with both the plain language and the legislative purpose of the relevant statute. The statutory definition of “discharge” under section 172 (8) applies not only to private lawsuits such as the instant one brought under section 181 (5), but to the entirety of article 12 of the Navigation Law, commonly known as the “Oil Spill Act,” which is set forth in sections 170 through 197 of the Navigation Law (State of New York v Green, 96 NY2d 403, 406 [2001]). Thus, any interpretation of the term “discharge” that this court reaches must harmonize not only with section 181, but also with the remaining provisions of the Oil Spill Act.
*317 “[T]he Oil Spill Act . . . was enacted to ensure swift, effective cleanup of petroleum spills that threaten the environment.” (State of New York v Green, 96 NY2d 403, 406 [2001].) “To achieve this objective, the Legislature established the ‘Environmental Protection and Spill Compensation Fund,’ which finances State cleanup efforts when the discharger is unknown, unwilling or unable to pay these costs.” (Id., citing Navigation Law § 179.) “Once the Fund has disbursed monies for the cleanup, it must then seek reimbursement from a responsible party” (id., citing Navigation Law §§ 187 [1]; 188).
The statute expressly directs that its terms “shall be liberally construed to effect its purposes” (§ 195), noting that the act is “necessary for the general health, safety, and welfare of the people of this state” (id.). The Second Department has stated on several occasions that the act’s purposes include, “inter alia, to require the prompt cleanup and removal of oil and fuel discharge, to minimize damage to the environment, to restore the environment to its ‘pre-spill condition’ and to compensate those damaged by such discharge.” (AMCO Intl. v Long Is. R.R. Co., 302 AD2d 338, 340 [2d Dept 2003]; accord Turnbull v MTA N.Y. City Tr., 28 AD3d 647 [2d Dept 2006].) The act itself states its “purpose” as follows:
“to ensure a clean environment and healthy economy for the state by preventing the unregulated discharge of petroleum which may result in damage to lands, waters or natural resources of the state by authorizing the department of environmental conservation to respond quickly to such discharges and effect prompt cleanup and removal of such discharges, giving first priority to minimizing environmental damage, and by providing for liability for damage sustained within the state as a result of such discharges.” (Navigation Law § 171.)
Courts have consistently followed the statute’s explicit directive to liberally construe its terms. The Court of Appeals has broadly defined “discharger” to include a landowner that “can control activities occurring on its property and has reason to believe that petroleum products will be stored there.” (State of New York v Green, 96 NY2d 403, 405 [2001].) Similarly, the Second Department has broadly interpreted the statute to favor plaintiffs bringing private causes of action. When the statute was amended to add section 181 (5), expressly providing for a private right of action, the Second Department ruled that the statute applied retroactively because it was “remedial in *318 nature” and “simply expanded the common-law right to recover damages which previously existed” (see Leone v Leewood Serv. Sta., 212 AD2d 669, 670-671 [2d Dept 1995]). The statutory phrase, “lands from which it might flow or drain into [surface water or groundwater]” (Navigation Law § 172 [8] [emphasis added]), must therefore be given a similarly liberal interpretation to effect the statutory purpose of encouraging swift cleanup of petroleum spills in order to avoid or mitigate ecological damage. With this in mind, the court turns to the language at issue.
The phrase “from which it might flow or drain” modifies the word “lands.” (Id. [emphasis added]; see Russin Beer v Phoenix Beverages, 200 AD2d 659, 661 [2d Dept 1994] [“Generally, qualifying words and phrases are to be applied to those words and phrases preceding them”].) Such a phrasing leads this court to conclude that the nature of the land upon which the oil spilled is the relevant consideration under the statute, and not the quantity of the spill. The statute does not set forth any minimum quantity of petroleum product that must be released before the statute’s provisions apply, nor does it foreclose strict liability for “de minimis” spills. Of course, a defendant may be able to demonstrate that a de minimis spill resulted in no damages, but damages are a separate question from liability. (Novick v Sun Oil Co. of Pa., 103 AD2d 800 [2d Dept 1984].)
The statutory language requires no minimum geographic proximity between the affected “lands” and state waters, and neither does existing case law (see e.g. Merrill Transp. Co., 94 AD2d at 42 [holding the act covers discharge on highway]). On the other hand, the statute cannot by its terms apply to all lands within the state: “Words [of a statute] are not to be rejected as superfluous where it is practicable to give each a distinct and separate meaning” (Cohen v Lord, Day & Lord, 75 NY2d 95, 100 [1989]), and therefore the act requires some nexus between the petroleum emission and the waters of this state, however minimal. (See Luden v Satellite Vision, Inc., 2000 WL 309297, *2 [Sup Ct, NY County, Feb. 15, 2000, No. 99-09095] [“New York State Navigation Law is directly and irretrievably connected with ‘the waters of the State’ ”].)
Therefore, the act must be read to allow some room for a defendant to demonstrate that the particular “lands” upon which petroleum spilled are so disconnected from the ecosystems of this state that it would be physically impossible for spilled petroleum to flow or drain from those lands into state waters. *319 For instance, a defendant might show that the spill occurred within an industrial facility specifically designed to prevent the flow or drainage of petroleum off of the site. But such a defense must be narrowly construed, in light of the legislative purpose of the act and the mandated broad construction of its terms.
In the instant case, this court takes judicial notice, as it is empowered to do (see Domermuth, 111 AD2d at 959), that oil spilled onto ordinary land such as a residential lot can seep through the ground. The rate at which such seepage might occur, the distance of seepage, and the overall probability that it will eventually reach the groundwater, will depend upon complex variables that may sometimes require the testimony of an expert. But it would undercut the entire purpose of the act to require a first responder to an oil spill to enlist expert testimony to demonstrate that the spilled oil, if it had been left in place, would have eventually reached waters of the state. Moreover, the more rapidly and successfully a party responds to mitigate or clean a petroleum spill, the less likely that party will be able to show with any level of certainty that the spilled petroleum would have reached state waters. Actors who move quickly, consistent with the purpose of the statute, to mitigate or clean a spill in order to minimize the likelihood that it will reach state waters, should have reasonable confidence that they will be able to recover cleanup costs and other damages at a later date from the responsible party. Requiring a certain threshold of proof that a spill on open land would have eventually flowed or drained into waters, lest the responders be barred recovery under the act, would create a perverse incentive for hesitation, which in turn would result in greater ecological harm. (Cf. White v Long, 85 NY2d 564, 569 [1995] [“Interpreting the statute to allow reimbursement is, moreover, consistent with the purpose of the Navigation Law, which is to ensure prompt and effective cleanup of environmental pollutants”].)
The court is aware that, in the present case, the defendants both caused the spill and undertook its cleanup. But this does not alter the court’s analysis of the policy considerations supporting a liberal construction of “discharge.” The defendants’ own description of events supports an inference that if they had not acted swiftly in response to the tank overfill, the spill would have been larger in volume and the likelihood of ecological damage would have been greater. The defendants state that they took immediate steps to mitigate the size of the spill *320 by removing five gallons of oil from the tank to prevent further overflow. They also describe protocols they followed to clean up which prevented further spread of the spill, and they represent that testing conducted after their cleanup revealed no further contamination of the soil. If defendants’ representations are true, such an outcome is exactly what the Oil Spill Act is intended to ensure. If a “minor” spill such as the one at issue here were removed from the purview of the Oil Spill Act, irresponsible parties might fail to take the ameliorative measures needed to avoid contamination.
Based on the foregoing considerations, the court concludes that, under ordinary circumstances, the “lands” beneath and surrounding a single family residence, such as the plaintiffs’, constitute as a matter of law “lands from which [petroleum] might flow or drain” into surface or groundwater. The defendants have presented no evidence of any unique circumstances that would warrant a different conclusion here. Accordingly, the court finds that as a matter of law the defendants have “discharged” petroleum within the meaning of the Oil Spill Act, triggering strict liability.
Defendants state that they are “ready, willing and able to face the music and defend the case on damages.” In their arguments opposing this motion, the defendants emphasize that when the overfill occurred they responded promptly, prevented further spillage, followed proper cleaning and reporting protocols, and succeeded in thoroughly cleaning the spill. The present record suggests a genuine issue of material fact as to the scope of the spill and the thoroughness of the cleanup. But these issues of fact go to damages, not liability. “[I]t is well settled that questions relating to the amount or extent of damages do not preclude the granting of summary judgment on the liability question.” (Novick v Sun Oil Co. of Pa., 103 AD2d 800, 801 [2d Dept 1984]; see also CPLR 3212 [c].)
The plaintiffs’ request for partial summary judgment is hereby granted, and the court hereby finds that the defendants as a matter of law are strictly liable under Navigation Law § 181 for the discharge of petroleum onto the plaintiffs’ property.
Dismissal of Affirmative Defenses
The plaintiffs also move for an order dismissing the first and fourth affirmative defenses asserted by the defendants in their answer, namely that (1) the plaintiffs were guilty of culpable *321 conduct, including contributory negligence and/or assumption of risk, and (2) the plaintiffs failed to take all reasonable measures to reduce, mitigate and/or minimize the damages alleged.
The defendants do not oppose this branch of the plaintiffs’ motion. Upon review of the papers submitted by the plaintiffs, it appears to the court that plaintiffs are entitled to the requested relief. This branch of the motion is therefore likewise granted, and it is hereby ordered that the defendants’ first and fourth affirmative defenses asserted in their answer are dismissed.